ITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **MARION SINCLAIR,** | 2:18-CV-14042-TGB-MJH |
| Plaintiff, | |
| vs. | **ORDER DENYING MOTION TO FILE SECOND AMENDED CLASS ACTION COMPLAINT** |
| **ANDY MEISNER,** et al., | |
| Defendants. | |

Michigan resident Marion Sinclair, plaintiff in this case, alleges that the Defendants, various local government units, private entities, and public officials, have conspired to unconstitutionally deprive Plaintiff and others of their equity in their homes by taking them in tax foreclosure proceedings. Plaintiff's original complaint was dismissed without prejudice, but the case was stayed because parties and the Court believed that the Sixth Circuit's pending ruling in *Freed v. Thomas*, 976 F.3d 729 (6th Cir. 2020), would have some bearing on the merits of any amended complaint. ECF No. 39. It did not, so following the decision by the Court of Appeals in *Freed*, Plaintiff timely filed a motion to amend with a proposed amended complaint attached. Defendants respond in opposition, arguing the law does not recognize the property right of which

1

Plaintiff claims to be deprived, and that any amendment would be futile. For the reasons that follow, the Motion to Amend the Complaint is **DENIED**.

## I. BACKGROUND

Marion Sinclair seeks to represent a proposed class of former property owners in Southfield who claim to have been unconstitutionally deprived of property interests when their homes were lost through tax foreclosure proceedings. Proposed Am. Compl. ¶ 61, ECF No. 51-1, PageID.825.

Understanding Plaintiff's legal claims requires a preliminary discussion of the Michigan General Property Tax Act ("GPTA"). MCL §§ 211.1-211.157. The GPTA's purpose is to facilitate the efficient payment of property taxes and the efficient return of delinquent properties back to the tax rolls. When relevant municipal authorities determine that taxes are past due on a property, the owner of the property faces one of two scenarios: (1) the owner is able, within the statutory time limits, to pay their back taxes and redeem their property, or (2) the property is foreclosed on and sold, and the property is returned to the tax rolls after the municipality recovers as much as it can in owed taxes and fees.

The treasurer of a county can elect to act as the "foreclosing government unit" or "FGU" who facilitates the resolution of any delinquent tax payments and administers notification regarding redemption opportunities and eventual foreclosure and sale. If the county

treasurer does not elect to act as the FGU, the state will. However, most counties in Michigan (including Oakland County, where Southfield is located) have elected to have their treasurer perform this function. MCL 211.78.

The GPTA sets out the procedures and timelines that govern this process. Each year, property taxes unpaid as of March 1 are identified to the treasurer as delinquent. Once a property becomes delinquent, the treasurer initiates a prescribed schedule of notice and hearing opportunities over the course of twelve months, giving owners a chance to redeem their property. MCL 211.78b-g. If the property is not redeemed in that time, it is "forfeited" to the treasurer. This does not affect title, but allows the treasurer to list the property on the tax rolls as forfeited and file a petition in circuit court seeking foreclosure. The GPTA also includes notice procedures and requirements regarding this foreclosure hearing in circuit court, creating continuing opportunities for redemption by the owner. MCL 211.78h. The taxpayer's right to redeem the property expires on the March 31 immediately following entry of judgment on the foreclosure petition (generally falling about two years after the initial delinquency finding). If delinquent taxes are not paid by that date, title transfers to the treasurer. MCL 211.78k(5)-(6).

During the time frame when the events at issue in this lawsuit occurred, the statute required that after title transferred to the treasurer, the municipality where the property was located had a right of first

refusal ("ROFR") to buy the property for a "minimum bid" equal to the delinquent taxes and any fees owed. *See* ECF No. 51-1, PageID.819. If the relevant municipality did not exercise its ROFR, the property would usually be put up for auction by the treasurer to attempt to recover what was owed. Any monies obtained by the treasurer, either through a ROFR sale or through auction, went towards a general fund used to pay off delinquent taxes to municipalities. *See generally Rafaeli, LLC v. Oakland Cty.*, 952 N.W.2d 434, 443-49 (Mich. 2020) (providing an overview of the GPTA framework). [1]

In Plaintiff's case, she fell behind on the property taxes for her home in Southfield sometime between 2013-14. Her property forfeited to the Oakland County Treasurer around June 12, 2015. Proposed Am. Compl. ¶ 56, ECF No. 51-1. A judgment of foreclosure was entered in Oakland County Circuit Court on February 2, 2016. *Id.* at ¶ 57. Plaintiff was not able to redeem her property before March 31, 2016, so title vested in the Oakland County Treasurer. *Id.* The delinquency on her property was reported on the judgment of foreclosure as $22,047.46. *Id.* at ¶ 58. On

---

[1] The Michigan legislature has since amended the GPTA and significantly modified the post-foreclosure procedure; these changes went into effect for any properties found to be delinquent after January 1, 2021. Now, municipalities wishing to exercise the right of first refusal on a foreclosed property must pay the greater of the minimum bid or the fair market value of the property. MCL 211.78m. The legislature has specifically noted that this provision is not retroactive unless the Michigan Supreme Court decides it is. MCL 211.78t(1)(b).

July 7, 2016, the City of Southfield exercised its ROFR and purchased the property for $28,424.84. On September 22, 2016, the property was conveyed to the Southfield Neighborhood Revitalization Initiative, a for-profit limited liability company or LLC, for $1. *Id.* at ¶ 60.

Plaintiff makes several allegations as to how this sequence of events violated her constitutional rights. She is suing a variety of Defendant actors that can be separated into three groups: (1) the Oakland Defendants (Oakland County and Andy Meisner, Oakland County Treasurer), (2) the Southfield Public Defendants (the City of Southfield, City Administrator Frederick Zorn, and Mayor Kenson Siver), and (3) the Southfield Private Defendants (the Southfield Nonprofit Housing Corporation or "SNHC" and the Southfield Neighborhood Revitalization Initiative or "SNRI").[2]

First, Plaintiff alleges that because Southfield paid more for her property than her actual delinquency, Oakland County received a surplus of funds when it sold her home, which should be paid out to her. Second, and more centrally, she alleges the various Southfield Public and Private Defendants are involved in a "scheme" to deprive certain homeowners of their properties at low prices so that they can "flip" them and make a profit on them, without compensating the owners. The

---

[2] Plaintiff indicates that any other Defendants previously named in the lawsuit would not be included in the proposed Second Amended Complaint. ECF No. 51, PageID.805.

alleged scheme goes like this: the non-profit SNHC funds Southfield's purchase of these properties through the ROFR process; then, Southfield sells the properties to the for-profit SNRI for the minimal consideration of $1; eventually, SNRI sells them for a much larger profit.[3] SNRI is alleged to have been incorporated in 2016 with the blessing and knowledge of Southfield city administrators for the sole purpose of acting as the "receiving" entity for these properties. By selling the forfeited property, SNRI realizes any "equity" in the property,[4] alternatively characterized as its fair market value or the difference between the delinquency and whatever profit that is eventually made from the sale. The dollar value of that equity, under this system, is never returned to the original homeowner. *See* ¶¶ 34-45, ECF No. 51-1.

Plaintiff asserts in her proposed Second Amended Complaint that the post-foreclosure sales of her property to Southfield and then to SNRI constituted an illegal taking in violation of the Fifth and Fourteenth Amendments and Article X, Section 2 of the Michigan Constitution, and that they involved procedural due process violations under the

---

[3] Although the above chain of events describes the typical "scheme" according to Plaintiff, and this type of sale has occurred in other, similar lawsuits brought in this District, in our case the record does not indicate whether SNRI has yet re-sold Plaintiff's house or otherwise made any profit on it.

[4] Plaintiff alleges that SNRI is "controlled in large part by City of Southfield officials," implying that Southfield also receives some benefits from SNRI's activities. ¶ 5, ECF No. 51-1.

6

Fourteenth Amendment. She also brings claims of unjust enrichment and civil conspiracy. The Court issued a consolidated briefing schedule in response to the instant motion, which all Parties timely followed, and then heard oral argument on January 5, 2022. In addition to the anticipated briefing, Plaintiff also filed a supplemental brief related to the issue of whether Oakland County truly received a surplus payment, to which the Southfield Public Defendants filed a response and Plaintiff filed a reply. ECF Nos. 59, 60, 61. These issues are now ripe for review.

## II. STANDARD OF REVIEW

The decision to grant or deny a motion to amend is within the sound discretion of the Court. *See Robinson v. Michigan Consol. Gas Co., Inc.*, 918 F.2d 579, 591 (6th Cir. 1990). A party may amend a pleading after the opposing party's responsive pleading has been filed only by leave of court or by written consent of the adverse party. Fed. R. Civ. P. 15(a)(2). Rule 15(a) provides that "leave shall be freely given when justice so requires." *Id.* However, amendments should not be permitted in instances of "undue delay in filing, lack of notice to the opposing party, bad faith by the moving party, repeated failure to cure deficiencies by previous amendments, undue prejudice to the opposing party, and futility of amendment." *Foman v. Davis*, 371 U.S. 178, 182 (1962).

The Sixth Circuit has held that amendment is futile if a proposed amended complaint would not survive a motion to dismiss. *Neighborhood Dev. Corp. v. Advisory Council on Historic Pres.*, 632 F.2d 21, 23 (6th Cir.

7

1980). In evaluating whether a complaint would survive a motion to dismiss, courts "must construe the complaint in the light most favorable to the plaintiff, accept all well-pled factual allegations as true and determine whether the plaintiff undoubtedly can prove no set of facts consistent with their allegations that would entitle them to relief." *League of United Latin Am. Citizens v. Bredesen*, 500 F.3d 523, 527 (6th Cir. 2007) (citing *Kottmyer v. Maas*, 436 F.3d 684, 688 (6th Cir. 2006)).

Though this standard is liberal, it requires a plaintiff to provide "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action" in support of her grounds for entitlement to relief. *Albrecht v. Treon*, 617 F.3d 890, 893 (6th Cir. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007)). Under *Ashcroft v. Iqbal*, the plaintiff must also plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." 556 U.S. 662, 678 (2009) (citation omitted). A plaintiff falls short if she pleads facts "merely consistent with a defendant's liability" or if the alleged facts do not "permit the court to infer more than the mere possibility of misconduct." *Albrecht*, 617 F.3d at 893 (quoting *Iqbal*, 556 U.S. at 678-79).

### III.   ANALYSIS

#### A. The *Rafaeli* decision

An analysis of Plaintiff's claims first requires some discussion of the Michigan Supreme Court's recent decision in *Rafaeli, LLC v. Oakland*

8

*Cty.*, where the Court engaged in a thorough review of the GPTA and the property rights that it conveys. 952 N.W.2d 434 (Mich. 2020).

The plaintiffs in *Rafaeli* were former homeowners whose properties were foreclosed on, under the operation of the provisions of the pre-2021 GPTA. The properties were not bought by a municipality through the ROFR, but were instead sold at auction. The proceeds at auction were often significantly greater than the amount of back taxes owed to the state. *Id.* at 438-39 (noting that although the plaintiff's delinquency at the time of foreclosure was $285.81, his property was eventually sold at auction for $24,500). Plaintiffs challenged the Oakland County Treasurer's practice of keeping those surplus funds, rather than returning them to the original property owner, as an unconstitutional taking.

The Michigan Supreme Court held that the County's failure to return the surplus from the sale to the original property owners was in fact an unconstitutional taking under the Michigan Constitution. *Id.* at 466. After recognizing that the GPTA does not specifically identify whether taxpayers have a property interest in the surplus of any proceeds from a foreclosure sale, the Court engaged in an extensive common-law analysis and found that "an owner of real or personal property has a right to any surplus proceeds that remain after property is sold to satisfy a tax debt. Just as the Magna Carta protected property owners from uncompensated takings, it also recognized that tax

9

collectors could only seize property to satisfy the value of the debt payable to the Crown, leaving the property owner with the excess." *Id.* at 454-55. This right continues even after title transfers from the property owner to the treasurer: "[i]n the same way that the foreclosure process does not eliminate the former property owner's interest in the personal property that sits on the foreclosed land, the vesting of fee simple title to the real property does not extinguish the property owner's right to collect the surplus proceeds of the sale." *Id.* at 461.

### B. Counts I and II—takings claims

Like the plaintiffs in *Rafaeli,* Ms. Sinclair seeks to bring a state inverse condemnation claim under Article X, Section 2 of the Michigan Constitution. She also brings a federal takings claim under 42 U.S.C. § 1983. ECF No. 51-1, PageID.829-32. To make out a federal takings claim, a plaintiff must (1) show a cognizable property interest and (2) show that a taking occurred. While the Constitution protects property interests, it does not create them: state, federal, and common law are the source of these interests. *Coal. for Gov't Procurement v. Fed. Prison Indus., Inc.*, 365 F.3d 435, 481 (6th Cir. 2004). Although the Michigan Constitution is generally more protective of property rights than the federal Constitution, a similar analysis applies. *Rafaeli*, 952 N.W.2d at 449-50. Therefore, as a threshold matter, Sinclair must allege a "cognizable property interest" for any takings claims to have merit.

10

As noted, Sinclair alleges facts supporting two theories for her takings claim. The first is that the Oakland County Treasurer received a small surplus of funds when it sold her property: an amount slightly in excess of the delinquent taxes and fees. Under the decision in *Rafaeli*, the treasurer's retention of that excess amount is an unconstitutional taking. The second theory is that the combined actions of Oakland County and Southfield have deprived her of a property interest as related to the equity in her property, because the actual value of her house was much more than just the tax delinquency. She alleges that her property should have been sold for its "fair market value" with any surplus proceeds over the tax delinquency returned to her, and that Oakland County's failure to do so is a taking without just compensation.

**1. Surplus theory**

Plaintiff is correct that according to the holding of *Rafaeli,* if Oakland County were to sell her house, receive an amount in excess of the tax delinquency owed, and fail to return it to her, this would be an unconstitutional taking. As evidence that Oakland received a surplus, she points to the fact that the dollar figure listed on the judgment of foreclosure for her house ($22,047.46) is less than the amount Southfield eventually paid for her house ($28,424.84). *See generally* ECF No. 59. But in emails included as exhibits to Plaintiff's briefing and at oral argument, counsel for the Oakland Defendants explained that the dollar figure on the foreclosure judgment was missing several years of delinquent taxes

11

on it and that the amount Southfield eventually paid exactly equals the amount that was owed on the property. ECF No. 59-1. Defendants provided evidence of the delinquencies from each year that Plaintiff did not pay taxes, and those figures add up to $28,424.84. *Id*. Given this explanation for the discrepancy, the Court finds that Plaintiff has not shown more than a "mere possibility of misconduct" on the part of the Oakland Defendants. If they did not in fact retain a surplus from the sale, Plaintiff's takings claim under this theory would not survive a motion to dismiss.

### 2. Equity theory

Plaintiff's second argument is that her "cognizable property interest" was not just in any surplus proceeds, but in the fair market value or equity of her home. A similar argument was advanced by the plaintiffs in *Rafaeli,* but the Michigan Supreme Court clearly defined the property interest it was recognizing as the "surplus proceeds" paid to the treasurer as a result of the sale by auction, and only that. 952 N.W.2d at n.134 (holding that "the property improperly taken was the surplus proceeds, not plaintiffs' real properties," and stating that "we are unaware of any authority affirming a vested property right to equity held in property generally."). So the problem with Plaintiff's argument is that it advances a theory that was explicitly not recognized by the majority opinion in *Rafaeli*. Plaintiff does find support for her theory in the concurring opinion of Justice Viviano ("I conclude that the property right

12

that has been taken from the plaintiffs is their equity in their respective properties and not any independent interest in the surplus proceeds from the tax-foreclosure sale."), *id.* at 467, but this theory was not adopted by the majority, which stated that the Court was "unaware of any authority affirming a vested property right to equity held in property generally." Plaintiff's theory was *not* the holding of the case, and the fact that the majority did not follow Justice Viviano suggests that Plaintiff's theory is not consistent with *Rafaeli*. Additionally, post-*Rafaeli*, courts in this district have uniformly interpreted that case as foreclosing the "equity as a cognizable property interest" argument. *See Hall v. Meisner*, No. 20-12230, 2021 WL 4522300, at *10 (E.D. Mich. Oct. 4, 2021) (Borman, J.); *Freed v. Thomas*, No. 17-CV-13519, 2021 WL 942077, at *4 (E.D. Mich. Feb. 26, 2021) (Friedman, J.); *Est. of Johnson v. Meisner,* No. 19-11569, 2021 WL 3680479, at *4-5 (E.D. Mich. Aug. 18, 2021) (Tarnow, J.).

Plaintiff argues that there are factual differences between the cases. It is true that the "equity" argument in *Rafaeli* was not the main issue under consideration. In that case the State directly received the surplus in proceeds—in which the Court recognized that the original property owner had a clear property interest. The question of whether there is also a property interest in "equity" arose when the *Rafaeli* Court discussed what just compensation should be available to the plaintiffs as a remedy for the unconstitutional taking they suffered. But in making this determination, the Court stated that just compensation is only due

13

for "property taken." That compensation was subsequently calculated to be only the surplus proceeds. 952 N.W.2d at 465. The Michigan Supreme Court was not confronted with a case like this one, where the state did not receive any surplus in proceeds but where the state's procedure nonetheless deprived the homeowner of any equity or fair market value that might be left in the property after the delinquency was paid. But the "just compensation" analysis from *Rafaeli* strongly suggests that the Michigan Supreme Court would not accept Plaintiff's argument that there is a vested property interest in equity generally.

The Court acknowledges the concerns raised by Justice Viviano's concurring opinion, which questions the logic of the majority's conclusion that homeowners have a property right in surplus proceeds, but not in equity. Most homeowners would probably find the concept that they do not have any property interest in the equity of their homes to be confusing and counterintuitive. The *Rafaeli* holding also leads to the strange situation where Ms. Sinclair could have recognized some value out of her property if it had sold at *auction* for more than the amount of her delinquency; however, because Southfield bought her house through its ROFR for the amount of the delinquency, and sold it to a for-profit entity which could then resell it and realize the value of the home's equity, Ms. Sinclair will get nothing. A property interest in "surplus proceeds" only arises if, in the process of a sale, a surplus is generated. As Justice Viviano noted in concurrence, by limiting the property interest

14

in this way, the framework provided by the majority opinion "does not consider the property interests that exist before the sale." 952 N.W.2d 434, 474 (2020) (Viviano, J., concurring).

In response to *Rafaeli*, the Michigan Legislature amended the GPTA so that state or municipal entities seeking to exercise a ROFR must pay the greater of the delinquency on the property *or* the property's fair market value. If the ROFR sale is made at the fair market value, the treasurer must turn over any amount of the sales price in excess of the delinquent taxes to the former property owner. MCL 211.78m(1). This action by the legislature does appear to be directed toward allowing former property owners to realize the equity in their homes, even if they are lost to foreclosure. However, the sales described in this case were lawful at the time of the forfeiture of Plaintiff's property, and as discussed, the argument she advances in support of an unconstitutional taking has not been accepted by the Michigan Supreme Court. The Court's ruling in this case therefore reflects its best interpretation of how the Michigan Supreme Court would rule if the question were before it.

The Court finds that neither of Plaintiff's takings claims would survive a motion to dismiss, making amendment futile.

### C. Count III—procedural due process

Plaintiff also makes a due process claim against Oakland and Southfield, alleging that she and the proposed class members were deprived of due process as related to their property interest in equity.

15

Importantly, Plaintiff is not challenging any of the procedure or process leading up to the *foreclosure* on her property. Rather, she alleges she was unconstitutionally denied her equity—the fair market value of her home—because *post*-foreclosure, there was no process in place for her to redeem any excess funds if Oakland or a subsequent buyer (such as SNRI here) ended up paying that fair market value for her property. ¶¶ 93-98, ECF No. 51-1. But there must be an identifiable property interest to even raise the question of due process related to that interest, and the Court has already determined there is no property interest in the equity or fair market value of the home during foreclosure proceedings. Therefore, this claim also could not survive a motion to dismiss.

### D. Count IV—unjust enrichment

Plaintiff next makes a claim of unjust enrichment against all Defendants. "A claim of unjust enrichment requires the complaining party to establish (1) the receipt of a benefit by the other party from the complaining party and (2) an inequity resulting to the complaining party because of the retention of the benefit by the other party." *Karaus v. Bank of New York Mellon*, 831 N.W.2d 897, 905 (Mich. Ct. App. 2012). If the "benefit" in question does not flow directly from a plaintiff to a defendant, but instead goes to a third-party defendant, the plaintiff can only hold the third party liable if they can show some "misleading act by the third person" that eventually lead to them receiving the benefit. *Id.* at 906.

Defendants make various arguments as to why they have not been unjustly enriched. The Oakland Defendants maintain that the county did not receive any surplus, and that therefore there is no "benefit" that it can be shown to have received. ECF No. 52, PageID.861. This is true, as discussed above. The Southfield Public Defendants state that they legally purchased the property under the GPTA from Oakland and that even if there was some surplus, it did not go to Southfield, meaning they did not receive any "benefit." ECF No. 54, PageID.1074. This is also accurate. The Southfield Private Defendants' response is that they have no obligation under law or equity to return the proceeds of any future sale to Plaintiff—they lawfully acquired the property and have no legal obligation to her. ECF No. 53, PageID.950-53. All three groups of Defendants conclude that any unjust enrichment claim is futile because it would be dismissed under a 12(b)(6) motion.

The gist of Plaintiff's argument is that it is unjust for any entity to profit off her former property without her receiving any of the benefit. To begin, there is no plausible evidence that the Oakland Defendants *did* receive any profit or benefit. They received the delinquent taxes and nothing more. To the extent that the subsequent property owners—the City of Southfield or the SNRI—received a benefit, they are third-party beneficiaries, and Plaintiff has not shown any misleading or deceptive conduct on their part. Each transaction in this case was lawful and

17

followed the requirements of the then-applicable GPTA. An unjust enrichment claim would not survive a motion to dismiss.

### E. Count V—civil conspiracy

Plaintiff's last claim is for civil conspiracy under 42 U.S.C. § 1983, defined as "an agreement between two or more persons to injure another by unlawful action." *Bazzi v. City of Dearborn*, 658 F.3d 598, 602 (6th Cir. 2011) (quoting *Revis v. Meldrum,* 489 F.3d 273, 290 (6th Cir. 2007). Here, the unlawful action would be an alleged violation of Plaintiff's constitutional rights; there is no allegation that Defendants failed to follow procedures in the GPTA. But because the Court has already determined Plaintiff cannot make out a cognizable violation of her constitutional rights, she cannot maintain civil conspiracy claim either.

## CONCLUSION

For the reasons set out above, Plaintiff's Motion to Amend is **DENIED.** Because the proposed amendments would be futile, the Complaint must be, and hereby is, **DISMISSED WITH PREJUDICE**.

**SO ORDERED,** this 28th day of February, 2022.

BY THE COURT:

/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge