UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

| | |
|---|---|
| **MARION SINCLAIR, et al.,** | **2:18-CV-14042-TGB-APP** |
| Plaintiffs, | HON. TERRENCE G. BERG |
| **v.** | **ORDER DENYING PLAINTIFF SINCLAIR'S MOTION TO CERTIFY CLASS (ECF NO. 99)** |
| **COUNTY OF OAKLAND,** | |
| Defendant. | |

Before the Court is Plaintiff Marion Sinclair ("Plaintiff")'s Motion to Certify a Class Action. Defendant Oakland County foreclosed on Plaintiff Marion Sinclair's property for failure to pay delinquent taxes. The County then transferred the property to the City of Southfield for the amount of due taxes and fees owed, and Southfield then conveyed it for $1.00 to a for-profit company to repair and resell the property. Sinclair alleges that the market value of her home at the time it was foreclosed upon was greater than the amount of the delinquent taxes. But at no time during this process did the County ever pay Sinclair for the equity in her home.

Sinclair seeks to certify a class consisting of former Oakland County property owners who lost their property through a tax foreclosure process, where the property was then sold through a right of first refusal

program to a local municipality, whose property was worth more than the tax delinquency, and who were never compensated for the surplus equity of their homes. ECF No. 99. Defendant opposes certification. ECF No. 101.

For the reasons explained below, the Motion to Certify the Proposed Class will be **DENIED** (ECF No. 99).

## I.    BACKGROUND

The Court refers to its previous explanation of the background in this case. ECF No. 90, PageID.1743–49. Sinclair owned a home in Southfield, Michigan. After she fell behind on her property taxes—by $22,047.46—the Oakland County Treasurer initiated forfeiture and foreclosure proceedings against her under Michigan's General Property Tax Act, MCL §§ 211.1-211.157, eventually taking absolute title to her home. Before Oakland County's Treasurer put the tax-delinquent property up for auction, the City of Southfield exercised its statutory right of first refusal to buy the property for $28,424.84—a bid equal to the delinquent tax amount plus any fees owed. *See* MCL § 211.78m(1) (2015) (allowing municipalities to purchase foreclosed property for a "minimum bid," that is, the amount of delinquent taxes plus certain other charges).[1]

---

[1] The statute has since been amended. *See* MCL § 211.78m(1) (2021) (requiring municipalities to pay "the greater of the minimum bid or the fair market value of the property" to purchase foreclosed property).

In September 2016, Southfield deeded the property for $1.00 to a for-profit entity, the Southfield Neighborhood Revitalization Initiative ("SNRI"), formed for the purpose of purchasing, improving, and reselling foreclosed properties at market value. SNRI allegedly remains in possession of Sinclair's property at this point and has not yet resold it for profit. Though the market value of her home was allegedly more than she owed, Sinclair has not received any reimbursement for the difference between the fair market value of her home and the amount of her delinquent taxes. Plaintiff asserts SNRI purchased at least 140 tax-foreclosed properties from Southfield from 2012 to 2023 through the same scheme. ECF No. 99, PageID.2106.

## II.   LEGAL STANDARD

Federal Rule of Civil Procedure 23 governs class actions and sets forth requirements to certify a class. Class certification is appropriate when the moving party "affirmatively demonstrate[s] . . . compliance" with Rule 23." *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011) (noting that "Rule 23 does not set forth a mere pleading standard").

This is a two-step process. The party seeking class certification first must satisfy the four threshold showings under Rule 23(a) that:

(1) the class is so numerous that joinder of all members is impracticable;
(2) there are questions of law or fact common to the class;
(3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Fed. R. Civ. Proc. 23. These "four requirements—numerosity, commonality, typicality, and adequate representation—effectively limit the class claims to those fairly encompassed by the named plaintiff's claims." *Wal-Mart Stores, Inc.*, 564 U.S. at 349 (quotations omitted).

Next, the moving party must show that its proposed class "satisf[ies] at least one of the three requirements listed in Rule 23(b)." *Id.* at 345. For Rule 23(b)(3) classes like Sinclair's proposed class, the plaintiff must show "predominance (that "the questions of law or fact common to class members *predominate* over any questions affecting only individual members"), superiority (that "*a class action is superior* to other available methods for fairly and efficiently adjudicating the controversy"), and ascertainability (an implied requirement that the putative *class members can be readily identified* based on the class definition)." *Tarrify Properties, LLC v. Cuyahoga County, Ohio*, 37 F.4th 1101, 1105–06 (6th Cir. 2022)(emphasis added).

While district courts enjoy "broad discretion" in deciding whether class certification is appropriate, *In re Whirlpool*, 722 F.3d 838, 850, they must conduct a "rigorous analysis" that shows that all of Rule 23 prerequisites are met prior to certifying a class. *In re Am. Med. Sys., Inc.*, 75 F.3d 1069, 1078–79 (6th Cir. 1996).

## III.  DISCUSSION

On May 30, 2024, Plaintiff filed a Motion for Class Certification. ECF No. 99. She seeks to certify a class defined as follows:

> All persons and entities that owned real property in Oakland County whose real property, during the relevant time period, was seized through a real property tax foreclosure and subsequently purchased via a local municipality's right of first refusal program (MCL 211.78m), which was worth more than the total tax delinquency taxes owed and were not refunded the surplus equity in excess of the delinquent tax amount.

*Id.* at PageID.2096–97.[2] In view of recent Sixth Circuit case law, Plaintiff faces an uphill battle in attempting to certify a class whose members seek to recover their property's surplus equity. This is because the major issue in this case is the likely need for an individualized inquiry into the fair market value of each putative class member's property to determine (1)

---

[2] Plaintiff confirmed her proposed class does not include real properties purchased at a public auction. ECF No. 99, PageID.2108. Defendant complains that Plaintiff improperly expanded the class definition from the Complaint filed when she was representing herself in 2018 by including properties throughout Oakland County as opposed to solely in the City of Southfield. Judge Borman rejected such an expansion in *Hall v. Oakland County*, 2024 WL 209702, at *14 (E.D. Mich. Jan. 19, 2024). But this Court allowed an amended complaint including the class action allegation, without evaluating any scope or timeliness issue, deeming "problems with the scope of class definitions ultimately will be litigated at class certification." *Sinclair v. Meisner*, 2024 WL 1184674, at *7 (E.D. Mich. Mar. 19, 2024). The Court need not decide whether the scope was improperly expanded or whether the amendment fails to relate back to the initial complaint because class certification will be denied on other grounds.

5

who falls within the class and who does not as well as (2) individual damages.

In recent decisions, the Sixth Circuit has explained, confirmed, and repeated that the need for such an individualized inquiry "presents a significant obstacle to class certification in class actions . . . in which plaintiffs are seeking surplus equity." *In re Sabree*, 2023 U.S. App. LEXIS 6218, at *3 (6th Cir. Mar. 15, 2023); *see also Tarrify*, 37 F.4th at 1107 ("Look at what you wish—ascertainability, predominance, or superiority—the district court reasonably rejected this class-certification motion given the individualized nature of each inquiry into the fair market value of each property at the time of transfer."). Indeed, after the briefing on this motion closed, the Sixth Circuit issued another opinion vacating and remanding the district court's decision granting class certification for a surplus equity class involving the same takings scheme as in this case in part because of this very issue. *See Bowles v. Sabree*, 121 F.4th 539, 554–55 (6th Cir. 2024). In *Bowles*, the Sixth Circuit emphasized its previous holding in *Tarrify* to the effect that "[d]etermining fair market value involves an 'individualized assessment' of each property and requires 'proof that is variable in nature and ripe for variation in application.' [cit. omitted] And when mini-trials 'become necessary to determine who is in and who is out, the class-action vehicle imposes inefficiencies rather than ameliorates them.'" *Id.* at 550, *citing Tarrify*, 37 F.4th at 1106–07.

6

In addition, two judges of the Eastern District of Michigan have recently issued decisions denying certification of two similar surplus equity classes earlier this year. *See Hall v. Oakland County*, 20-cv-12230, 2024 WL 209702, at *15 (E.D. Mich. Jan. 19, 2024) (Borman, J.); *Taylor v. County of Oakland*, 19-cv-12548, 2024 WL 188376, at *8 (E.D. Mich. Jan. 16, 2024) (Lawson, J.). The only class that was certified which Plaintiff relies on was decided two years *before Tarrify*. *See Arkona, LLC v. County of Cheboygan*, 2020 WL 4366027, at *1 (E.D. Mich. July 30, 2020).

As the courts held in *Tarrify*, *Taylor*, *Hall*, and *Bowles*, the need for an individualized inquiry into the fair market value of each separate property at the time of transfer weighs against finding that the class is ascertainable, common issues predominate, and that class action is superior to individual actions in this case. Thus, the Court will follow the reasoning of those courts and similarly deny class certification.

## A. Class Definition

For a class to be certified, "the class definition must be sufficiently definite so that it is administratively feasible for the court to determine whether a particular individual is a member of the proposed class." *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 537–38 (6th Cir. 2012) (citing 5 James W. Moore et al., *Moore's Federal Practice* § 23.21[1] (Matthew Bender 3d ed. 1997)). A class is sufficiently definite if the court can resolve the question of who is in and who is out of the class by

reference to "objective criteria." *Id.* at 538; *see, e.g.*, *Am. Copper & Brass, Inc. v. Lake City Indus. Prods., Inc.*, 757 F.3d 540, 545 (6th Cir. 2014) (finding that a record of fax logs listing each successful recipient by fax number "demonstrates that the fax numbers are objective data satisfying the ascertainability requirement"). But if "mini-trials" become necessary to determine class membership, the "class-action vehicle imposes inefficiencies rather than ameliorates them." *Tarrify*, 37 F.4th at 1106 (citing to *Sandusky Wellness Ctr., LLC v. ASD Specialty Healthcare, Inc.*, 863 F.3d 460, 470 (6th Cir. 2017), *as corrected on denial of reh'g en banc* (Sept. 1, 2017)).

Determination of class membership necessarily must be accomplished at the outset of class litigation in order to supply the required notice to putative Rule 23(b)(3) class members. *Taylor*, 2024 WL 188376, at *7; *see also* Fed. R. Civ. Proc. 23(c)(2)(B) ("For any class certified under Rule 23(b)(3) . . . the court must direct to class members . . . notice" of the action, class definition, class claims and defenses, binding effect of class judgment, and ability to appear and to request exclusion); *Cole v. City of Memphis*, 839 F.3d 530, 541 (6th Cir. 2016) (recognizing that "ascertainability aids the inherent efficiencies of the class device by ensuring administrative feasibility," which includes "the practical need to notify absent class members and to allow those members a chance to opt-out and avoid the potential collateral estoppel effects of a final judgment"); *Fox v. Saginaw County*, 67 F.4th 284, 302 (6th Cir. 2023) ("To

certify a class action, . . . a district court must forecast how the parties will conduct the litigation from the certification stage through the trial to the final judgment.").

Here, recall that Sinclair seeks to certify a class defined as follows:

> All persons and entities that owned real property in Oakland County whose real property, during the relevant time period, was seized through a real property tax foreclosure and subsequently purchased via a local municipality's right of first refusal program (MCL 211.78m), which was *worth more than the total tax delinquency taxes owed* and were not refunded the surplus equity in excess of the delinquent tax amount.

ECF No. 99, at PageID.2096–97 (emphasis added). Ascertaining class membership in Sinclair's proposed class thus requires a determination of what each putative class member's property was "worth" at the time of foreclosure. As to those whose property was "worth more than the total tax delinquency taxes owed," they are "in," but for those whose property was worth less than the total tax, they are "out." Sinclair asserts that determining whether the property was "worth more" is "easily calculable by subtracting the tax delinquency amount from the real property's fair market value." ECF No. 99, PageID.2116.

But the Sixth Circuit already found it unmanageable to ascertain class membership by relying on fair market value because determining such would require "proof that is variable in nature and ripe for variation in application" and therefore an "independent and individualized assessment of each absent class member's property." *Tarrify*, 37 F.4th at

9

1106–07 (noting that "the valuation of real property depends on many circumstances, including the size, location, use, and condition of the property and the relevant market conditions at the time of the transfer," which will vary for each property); *see also Fox*, 67 F.4th at 301 (noting that determining "the difference between the fair market value of their homes and the taxes they owe . . . necessitates fact-specific evidence about the worth of each class member's property on a property-by-property basis"). Such an individualized assessment would lead to "mini-trials" to ascertain class membership, making the class action mechanism inefficient. *Tarrify*, 37 F.4th at 1110. Plainly, the Sixth Circuit later confirmed that an "equity-based class" could not meet the ascertainability requirement. *Bowles*, 121 F.4th at 550..

And district courts post-*Tarrify* have similarly found that certification must be denied because an individualized inquiry is necessary to determine what the fair market value of each property was at the time of the foreclosure in order to know which properties were seized to satisfy debts that fell short of their fair market value. *See, e.g.*, *Taylor*, 2024 WL 188376, at *7; *Hall*, 2024 WL 209702, at *12. Here, even though class membership turns on a seemingly simple question—"does each property include surplus equity?"—each putative class member will have to offer proof that is variable in nature to determine the fair market value of the property at the time of foreclosure, leading to a myriad of

mini-trials that would make the class action process inefficient. *Tarrify*, 37 F.4th at 1106.

Sinclair offers alternative methods to ascertain class membership without necessarily relying on fair market value. She argues there is an alternative objective criterion that can determine class membership: whether a government entity exercised its Right of First Refusal ("ROFR") to seize the property and transfer it to a third party. ECF No. 105, PageID.2455–56. But unless Sinclair can prove that all properties seized under ROFR were worth more than the delinquent taxes owed, this argument fails because otherwise the class would necessarily include owners who suffered no injury.

Sinclair suggests narrowing the class definition to exclude abandoned properties, condemned properties, or properties with serious building ordinance violations—which are the kinds of properties more likely to be worth less than the delinquent taxes owed. *See Powers v. Hamilton Cnty. Pub. Defender Comm'n*, 501 F.3d 592, 618 (6th Cir. 2007) (affirming class certification but modifying class definition to exclude persons not represented by the Public Defender because it could not be held liable for harm to persons that it did not cause); *In re Flint Water Cases*, 558 F. Supp. 3d 459, 486 (E.D. Mich. 2021) (noting that the Court is "authorized to redefine the classes to provide narrower class-based relief when necessary to ensure that the 'class is properly constituted'").

11

But even the exclusion of abandoned properties does not affirmatively prove no other property could be worth less than the tax amount owed. Houses that have not been condemned or violated an ordinance could still be in such disrepair that they would be worth less than the tax owed, and it is not inconceivable that a government entity might exercise its ROFR on such an "undesirable property" in order to revitalize the neighborhood. Even Sinclair's house, Defendant alleges, was "dilapidated and in severe disrepair[,] . . . [t]he roof needed replacement, there was mold everywhere, the windows were essentially non-functional, as well as the plumbing, heating and cooling," and SNRI spent almost $190,000 on repairs, ECF No. 100, highlighting the fact-intensive nature of the inquiry into the value of each house to determine class membership.

Sinclair argues that the value of such non-excluded properties can be determined using property valuations, but the Sixth Circuit, again, already rejected that argument as property valuations are only a starting point to determining fair market value. *Tarrify*, 37 F.4th at 1107;[3] *see*

---

[3] Judge Lawson in *Taylor* summarized *Tarrify*'s reasoning as to property valuations: "(1) tax valuation is merely one data point that may have a bearing on market value, not a determination of market value per se, (2) variations in market conditions over time would require individualized assessments of market conditions at the time of each foreclosure, (3) tax valuations, unlike market sales, do not include any component of value based on the interior condition of the premises, (4) the methodology of tax valuation inherently is designed to be applied in gross, in order to achieve

*also Hall*, 2024 WL 209702, at \*11 (noting that the State Equalized Value (SEV) of a foreclosed property is not an ultimate determination of the fair market value of that property but instead just a measure of taxable value and one factor for the Court to consider along with other data, such as expert appraisals).

And Sinclair's attempt to distinguish this case from *Tarrify* based on Michigan's yearly assessment of property value—as opposed to Ohio's six-year assessment period—also fails. Even Michigan courts recognize that such an assessment does not determine with finality the fair market value of a property and is often considered along with expert appraisals offered by both parties and submitted to the fact-finder. *See In re Memorial Hall Site*, 316 Mich. 215, 220 (1946) (holding that tax assessment rolls, while "not controlling," had a bearing on the value of a condemned property and could be "considered in connection with all other evidence" to determine fair market value of the property); *see also City of Muskegon v. Berglund Food Stores, Inc.*, 50 Mich. App. 305, 311 (1973) (considering tax assessment along with "estimations of value by recognized and admittedly qualified appraisers"); *In re Urban Mass Transp. Facilities Project Michigan-UTG-4*, 28 Mich. App. 529, 533

---

uniformity in valuation and avoid peculiarly high or low valuations for individual properties, and (5) due to the inherent nature of real estate, the specific location of every property becomes a dominant component of the valuation, which is a feature entirely overlooked by a generalized tax valuation scheme." 2024 WL 188376, at \*7.

(1970) (noting that tax assessment and expert appraisals were offered by both parties and presented to the jury, because tax assessments, while having a material bearing on the issue, do not determine with finality the market value of a property).

While Sinclair claims the Court can rely on modern appraisal method reports—in addition to property valuations—such as those provided by the website HouseCanary[4] to determine fair market value when issuing mortgages, both parties have the opportunity to present their own expert appraisal. Such a need for expert appraisals in addition to property valuations "underscore[s] the fact-intensive nature of value determination" and the need for "mini-trials" to ascertain class membership. *See Taylor*, 2024 WL 188376, at *7; *Hall*, 2024 WL 209702, at *12. The problem is that Sinclair's proposed method of relying on property valuations, SEV, and expert appraisals cannot decisively determine fair market value, it simply offers additional evidence for the Court or jury to consider in their fact-intensive inquiry into the fair market value of each putative class member's foreclosed property.

---

[4] Plaintiff asserts that HouseCanary provides real estate valuation services and is used by national mortgage companies such as United Wholesale Mortgage. *See* ECF No. 99, PageID.2116 n.2. HouseCanary describes itself as the industry leading platform for AI-powered single-family real estate data and analytics. *See* HouseCanary Home Page, https://www.housecanary.com (last visited Jan. 2, 2025).

Thus, despite Sinclair's attempt to propose an objective criterion to determine class membership, the need to rely on property valuations and expert appraisals highlight the need to conduct "mini-trials" to ascertain class membership at the outset of litigation here—a particularly crucial requirement in Rule 23(b)(3) class actions where notice must be sent to putative class members to advise them of their rights and the opportunity to opt out. *See* Fed. R. Civ. Proc. 23(c)(2)(B). Therefore, because the class is unascertainable without a prior individual assessment as to the eligibility of each member, it cannot be certified. But the Court must continue its analysis because even if "surplus equity claims are unmanageable in takings class actions, . . . a rigorous analysis of Rule 23's requirements" is still required. *Bowles*, 121 F.4th at 548.

### B. Rule 23(a) Requirements

The burden is on Plaintiff to affirmatively demonstrate and provide "significant evidentiary proof" that a class action is appropriate—that the requirements for numerosity, commonality, typicality, and adequate representation are met—especially when it is contested. *See In re Ford Motor Co.*, 86 F .4th at 726 (citations omitted). Defendant does not address Plaintiff's arguments regarding numerosity, commonality, typicality, or adequate representation.

Here, there is at least one question common to the class whose resolution will affect all putative class members: whether Oakland County's actions amount to an unlawful taking in violation of the Fifth

Amendment. ECF No. 99, PageID.2110. Common evidence will be used to prove such liability to every class member. *Id*. at PageID.2105.

And Sinclair's claim is typical of the class that she seeks to represent because it "arises from the same event or practice or course of conduct that gives rise to the claims of other class members," and because her claims are "based on the same legal theory" as class members' claims, namely Oakland County's unconstitutional taking of her surplus equity following the foreclosure of real property, and class members all "share[] a desire to obtain both monetary" relief—the surplus equity in the property beyond the taxes owed—"and injunctive relief" from Oakland County, such that Sinclair has "common interests with unnamed members of the class." *See Vassalle v. Midland Funding LLC*, 708 F.3d 747, 757 (6th Cir, 2013).

And it appears to the Court that Sinclair and her attorneys, as representatives, will "vigorously prosecute the interests of the class through qualified counsel." *Id*. No attack on their credibility has been made, and their competency appears satisfactory, especially given the lawyers' vital role in obtaining the favorable *Hall* decision which held surplus equity to be a protected right.

However, it appears Sinclair has more difficulty proving numerosity. She alleges the class contains at least 140 individuals in Southfield, and up to 800 members in Oakland County. ECF No. 99, PageID.2109–10. Numerosity is a "low bar to clear", and the Sixth Circuit

16

has permitted classes of 35 members, but the plaintiff bears the burden to provide evidence supporting the estimated numbers. *See Bowles*, 121 F.4th at 553. Sinclair provides evidence that SNRI obtained 140 foreclosed properties in Southfield. ECF No. 99-1, PageID.2132. But this evidence does not show how many properties were "purchased via a local municipality's right of first refusal program," nor how many were "worth more than the total tax delinquency taxes owed." *See Bowles*, 121 F.4th at 553 ("We don't just need to estimate how many properties were sold at auction; we need to estimate how many properties were sold at auction *for more than the former owner's tax debt*.") (emphasis added). Therefore, and unsurprisingly, Sinclair cannot definitively show how numerous the class is for the same reason the Court cannot ascertain class membership.

### C. Rule 23(b)(3) Requirements

For Rule 23(b)(3) classes like Sinclair's proposed class, the plaintiff must show "predominance (that 'the questions of law or fact common to class members predominate over any questions affecting only individual members') [and] superiority (that 'a class action is superior to other available methods for fairly and efficiently adjudicating the controversy')[.]" *Tarrify*, 37 F.4th at 1105–06. But problems emerge on the predominance and superiority fronts when a "controlling issue requires individualized determinations ill-equipped for classwide proof." *Id.* at 1106. Indeed, the major issue in this case, as in *Tarrify*, *Taylor*, *Hall*, and *Bowles*, is the need for an individualized inquiry into the fair

market value of each putative class member's property to ascertain class membership and determine damages. This individualized inquiry weighs against finding that the class is ascertainable (as explained earlier), that common issues predominate, and that class action is superior to individual actions. *See Tarrify*, 37 F.4th at 1107 ("Look at what you wish—ascertainability, predominance, or superiority—the district court reasonably rejected this class-certification motion given the individualized nature of each inquiry into the fair market value of each property at the time of transfer.").

Sinclair asserts that "common evidence will be used to prove Oakland County's liability to every class member" such that common issues predominate over individual ones. But the "predominance criterion" is "more demanding" than the commonality requirement. *Zehentbauer Family Land, LP v. Chesapeake Expl., LLC*, 935 F.3d 496, 503 (6th Cir. 2019) (citation omitted). "[C]ommon questions do not alone make a class[, w]e then have to add up all the suit's common issues . . . . and all of its individual issues to qualitatively evaluate which side predominates over the other." *Bowles*, 121 F.4th at 554 (quotations omitted). The fact that the computation of damages is the "only individualized issue" does not mean it cannot overwhelm the common liability questions. *See id.* (vacating certification order and remanding for further analysis addressing potential difficulties that could hamper damages calculations).

As a result, the Sixth Circuit in *Fox* required court to "forecast how the parties will conduct the litigation from the certification stage through the trial to the final judgment" before certifying a class action. *Fox*, 67 F.4th at 302. (citation omitted). The Sixth Circuit identified several individual issues that could plague takings class litigation, including "(1) whether [the court] would calculate damages formulaically or with fact-specific mini trials, (2) whether the county would have unique defenses, like res judicata or standing, against individual class members, and (3) how non-class lienholders, like banks holding mortgages on certain properties, would factor into any recovery." *Bowles*, 121 F.4th at 554 (citing to *Fox*, 67 F.4th at 301–02).

Particularly relevant to our case here is the damages inquiry. *Fox* suggested that "[i]f a court may identify the amount of damages using a 'formulaic calculation' for each class member, common issues may well predominate. *Fox*, 67 F.4th at 301. But "if fact-specific damage trials 'will inevitably overwhelm' common liability questions, individual issues may predominate." *Id.* (citation omitted). In *Fox*, the court explained that damages calculated as the "difference between the fair market value of their homes and the taxes they owe . . . necessitate[] fact-specific evidence about the worth of each class member's property on a property-by-property basis . . . [which] could 'overwhelm' any common liability issues." *Id.*; *see also Tarrify*, 37 F.4th at 1107 ("The shifting facts and circumstances about the value of each property likely will dominate the

19

proceedings . . . and run the risk of undercutting the efficiencies and ease of administration that otherwise might favor classwide resolution of the claims."); *In re Sabree*, 2023 U.S. App. LEXIS 6218, at *2 (recognizing that the individualized factual inquiry into the value of each foreclosed property "might predominate over class issues and reduce the class action to 'myriad mini-trials' that defeat superiority").

As explained earlier, determining fair market value in this case will similarly require an individualized, fact-intensive, adversarial process which will overwhelm the somewhat comparatively straightforward question of constitutional violation. And the parties have not agreed on a different formula to determine the worth of each property at this time. Sinclair suggests, like she did to ascertain class membership, that the Court could rely on property valuation and expert appraisals to determine fair market value, thereby reducing the need for mini-trials. But these methods were rejected by the Sixth Circuit and other district courts not only for the ascertainability prong, but also for the predominance and superiority prongs. *See Tarrify*, 37 F.4th at 1107; *Hall*, 2024 WL 209702, at *11.

The only new proposal Sinclair raises is that the fair market value "can easily be determined by appointing a special master to appraise properties and determine damages." ECF No. 99, PageID2116–18. But this is not so new. The Sixth Circuit already explicitly rejected the assertion that appointing a special master to determine fair market value

20

disputes would make classwide relief "more palatable" because the proposal did not "cure the problem that this case will boil down to mini trials over each property's value upon transfer." *Tarrify*, 37 F.4th at 1109. And the Sixth Circuit also warned that "determining the fair market value of each potential class member's property" is "no easy task, *even for experts*," leading to "difficulties figuring out class membership" and undercutting the "efficiencies and ease of administration that might otherwise favor class-wide resolution." *Bowles*, 121 F.4th at 547 (emphasis added). Furthermore, the decision to appoint a special master is not only discretionary, but solely warranted by "some exceptional condition" or "the need to . . . resolve a difficult computation of damages." Fed. R. Civ. Proc. 53(B). Sinclair relies on a 1966 case from this District in which the court appointed a special master to argue this Court should do the same. *See Foster v. City of Detroit, Mich.*, 254 F. Supp. 655, 669 (E.D. Mich. 1966), *aff'd*, 405 F.2d 138 (6th Cir. 1968).

In *Foster*, after the court held the City of Detroit took property without just compensation, the court decided to appoint a special master to hear claims of unnamed parties for six months, determine their membership in the class, and assess the extent of their damages in accordance with the formula adopted by the court. *Id*. at 666–69.[5] That

---

[5] The court in *Foster* deemed it possible to determine class membership after the rendition of a favorable verdict where there was an identifiable class. 254 F. Supp. at 668. The court noted the class "has been identified

damages formula was the difference between the value of the property before and after the taking (plus interest, but minus any amounts which accrued to plaintiffs from their possession of the property) and the court used appraisals made for the City as a starting point. *Id.* at 666–67. The court found exceptional circumstances to appoint a special master "because of the extremely large number of potential intervenors"—over 50 persons in an area encompassing 25 city blocks—and "because as to most of these intervenors there will be no new question of law or fact, but merely matters of proof and computation of claimed damages." *Id.* at 668–69 n.25, n.32.

Here, while it is unclear how numerous Sinclair's proposed class is, it is allegedly more numerous than *Foster*'s. But unlike the court in *Foster*, this Court has not yet found Oakland County liable, and while the Sixth Circuit has announced the damages formula—fair market value at the time of the foreclosure—there is no "cognizable common theory for measuring the value in each property at the time of transfer," as explained earlier. *See Tarrify*, 37 F.4th at 1104. While the court in *Foster* chose the City's appraisal as the minimum value, it does not seem that Plaintiff in this case has agreed to the use of appraisals—or two times the State Equalized Value (SEV)—to determine damages because they

---

as consisting of those property owners within the 'Mich. 1-11' area who have been subject to the dual condemnation actions." *Id.* at 667. Importantly, the class was not *defined* by fair market value.

would be less than fair market value, ECF No. 105, PageID.2454 n.1, and courts in the Sixth Circuit have been clear that appraisals and property valuations are but one factor to consider. As a result, questions of fact remain which must be adjudicated by a jury. Unlike in *Foster*, most of the "intervenors" will have new questions of facts which will need to be submitted to the Court for determination, thereby undermining the special master's purpose.

Thus, in addition to causing problems in ascertaining class membership and showing numerosity, the need to determine fair market value predominates over common questions because it will require "fact-specific mini-trials" plaguing the takings class litigation, "potentially to the point of vitiating its worth" compared to individual suits. *See Bowles*, 121 F.4th at 554.

In a final attempt to obtain certification, Sinclair argues the Court should follow the majority view of other Circuits and not refuse to certify the class "merely on the basis of manageability concerns." *Mullins v. Direct Digital, LLC*, 795 F.3d 654, 663 (7th Cir. 2015) (citing to *In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 140 (2d Cir. 2001)); *Freund v. McDonough*, 114 F.4th 1371, 1378 (Fed. Cir. Aug. 20, 2024) (rejecting the "minority view" requiring "administrative feasibility" as part of the ascertainably test). But Sinclair acknowledges the Sixth Circuit adopted the minority view. ECF No. 105, PageID.2453; *see Tarrify*, 37 F.4th at 1106 (noting that the predominance requirement

"prompt[s] us to ask whether the proposed class action beats the conventional approach of resolving disputes on a case-by-case basis in terms of efficiency and *administrability*) (emphasis added). And even courts adopting the majority view recognized that "administrative feasibility may bear on whether class resolution is superior to individual resolution." *Freund*, 114 F.4th at 1378.

It is true that "if many proposed class members . . . have limited resources, one case pooling all claims might be better on time and cost fronts than several individual ones, for both the litigants and the judiciary." *Bowles*, 121 F.4th at 554; *see also Amchem Prod., Inc. v. Windsor*, 521 U.S. 591, 617 (1997) (noting that class actions help vindicate "the rights of groups of people who individually would be without effective strength to bring their opponents into court at all"); *Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 809 (1985) (noting that class actions provide plaintiffs with a voice who "would have no realistic day in court if a class action were not available"). However, "[b]y enabling enormous aggregation of claims and parties, class actions represent a significant departure from 'our constitutional tradition of individual litigation[,]'" and thus class actions "are the exception, not the rule[.]" *In re Ford Motor Co.*, 86 F.4th 723, 725–26 (6th Cir. 2023) (citing to *Brown v. Electrolux Home Prods., Inc.*, 817 F.3d 1225, 1233 (11th Cir. 2016)).

Therefore, the Court concludes that the need for an individualized inquiry into the fair market value of each property at the time of

foreclosure will predominate over common issues because it will require mini-trials to determine class membership and damages, thereby "impos[ing] inefficiencies rather than ameliorat[ing] them." *See Tarrify*, 37 F.4th at 1106.

All in all, because Sinclair failed to develop a "cognizable common theory for measuring the value in each property at the time of transfer," *see id.* at 1104, the proposed class definition failed to meet Rule 23(a) requirement of numerosity, Rule 23(b)(3) requirements of predominance and superiority, and the implied requirement of ascertainability. Sinclair's motion for class certification is **DENIED**.

## IV.   CONCLUSION

For the reasons explained above, Plaintiff's Motion for Class Certification is **DENIED** (ECF No. 99).

**SO ORDERED** this 7th day of January, 2025.

BY THE COURT:


/s/Terrence G. Berg
TERRENCE G. BERG
United States District Judge